IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 1, 2019 Session

## JUAN CERANO v. STATE OF TENNESSEE

Appeal from the Criminal Court for Shelby County
No. 14-01165      John Wheeler Campbell, Judge

_____

### No. W2018-02037-CCA-R3-PC

_____

The Petitioner, Juan Cerano, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his convictions of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony, and resulting thirty-year sentence. On appeal, the Petitioner contends that the post-conviction court erred in finding that he was not prejudiced by trial counsel's failure to include records from the Department of Children's Services with the appellate record on direct appeal of his convictions, which resulted in this court's being unable to review whether the trial court properly ruled that the records were inadmissible at trial. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Alexander D. Camp (on appeal), Jackson, Tennessee, and Stephen Barnes (at hearing), Memphis, Tennessee, for the appellant, Juan Cerano.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Factual Background

In March 2014, the Shelby County Grand Jury indicted the Petitioner for rape of a child and aggravated sexual battery. In August 2015, a jury found the Petitioner guilty as charged in the indictment.

On direct appeal of the Petitioner's convictions, this court gave the following account of the case's procedural history and the evidence presented at trial:

On August 11, 2014, the Defendant filed a motion for the production of Department of Children's Services ("DCS") records regarding prior allegations of abuse involving the victim for in camera inspection, arguing that "[t]he evidence in the DCS file could show that 1) [the victim's mother] has always been considered an unfit parent and 2) that [the victim's mother] has made several accusations against [the Defendant] that have been unfounded." On August 20, 2014, the Defendant filed a "memorandum to support motion to allow DCS records and medical records to be admissible." In the memorandum, the Defendant argued issues relating to admissibility and production, contending that he should "be allowed access to all relevant DCS records." Both the motion and memorandum, however, include attached exhibits that appear to be at least some of the victim's DCS and medical records. We glean from the record that on August 22, 2014, the trial court denied the Defendant's motion after an in camera inspection of the DCS records. The record does not include a transcript of the hearing on the Defendant's motion or the trial court's order denying the motion.

Before the trial and outside of the presence of the jury, the State and trial court discussed the Defendant's request to produce the DCS records. The State said, "Your Honor ruled [at a previous hearing] that the mention by the victim, that his mother had told him to lie and he had lied previously, could be used only to rebut his credibility. That the total of the DCS records and what else occurred is not admissible . . . ." The trial court responded, "Right. . . . [A]ny admission [the victim] made of not saying something that's truthful, that's fair game as far as I was concerned." The trial court noted that "other issues involving other people" were not relevant, unless those witnesses testified.

At trial, the victim, the Defendant's son, testified that he was born on January 25, 2002, and was thirteen years old at the time of trial. He stated that during the summer of 2013, he spent weekdays with his mother and weekends with the Defendant. He recalled that on the last weekend of the summer of 2013, the Defendant took him and his brother, J.C., to the Defendant's house in Memphis, Tennessee, which the Defendant shared with the victim's aunt and cousins. The victim testified that the Defendant's house had two bedrooms and that he slept in one of the

bedrooms with J.C. and his three cousins. The victim explained that later in the evening, the Defendant and others were on the front porch of the house drinking beer and ingesting cocaine. The victim walked onto the porch but was told to go back inside. He went back into the house to watch television with J.C. and his cousins in the bedroom, and they fell asleep in the bedroom.

The victim stated that the Defendant woke him up in the middle of the night while everyone else was sleeping. The victim explained that when the Defendant woke him up, the Defendant did not say anything to him but signaled to the victim to go into the living room. The victim stated that he was wearing a t-shirt and shorts and that the Defendant was dressed in a button-up shirt and jeans. The victim testified that once they were in the living room, the Defendant "told [him] to pull down [his] pants and bend over the couch." The victim stated that he began to cry and told the Defendant he did not want to comply. The victim described the Defendant as "acting mean" and drunk. He testified that the Defendant then "pulled down [his] pants and pushed [him] to the couch." The victim stated that when he landed on the couch bent over, the Defendant grabbed him by the waist and inserted his penis into the victim's anus. The victim described the Defendant's actions as "very painful." The victim stated that the Defendant inserted his penis multiple times into his anus. The victim testified that he did not look back at the Defendant but looked at the couch and cried.

The victim testified that after the Defendant stopped, the Defendant hit him with a belt "everywhere." The victim explained that he did not scream or yell because he was afraid. The victim stated that the Defendant told him to go back to the bedroom and that he complied and went . . . back to sleep.

The victim testified that on the following day, his anus hurt and that it was very painful to use the restroom and to sit down. He stated that the Defendant hit him again that evening as well. The victim played with J.C. and his cousins for the rest of the weekend. After returning to his mother's house on Sunday, June 24, 2013, the victim told his mother what the Defendant had done to him, and she took him to the LeBonheur Children's Hospital. While at the hospital, the victim spoke with a police officer about the rape. He informed the nurse who examined him about the rape, and she took photographs of him. The victim stated that a few days after the hospital examination, he spoke with Ms. Teresa Onry at the Child

- 3 -

Advocacy Center, and he told her about the rape and the Defendant's drug use.

The victim testified that although the Defendant "rocked [him] hard" to wake him on the night of the rape, the other child in the same bed as him did not wake up. The victim seemed to suggest that J.C., who was seven years old at the time, was the other person in the bed with him on the night of the rape. The victim stated that before the Defendant pulled his clothes down, he was not wearing underwear. He did not remember testifying at the preliminary hearing that he was wearing underwear and shorts. He also could not recall testifying at the preliminary hearing that the Defendant "yanked" off his shorts but "pulled" off his underwear. The victim did not remember telling the forensic interviewer that he could not recall what the Defendant was wearing the night of the rape. The victim testified that the Defendant threatened to hit him if he told anyone about the rape. The victim also testified that after the Defendant raped him, the Defendant hit him "really hard" with a belt, describing the pain on a scale of one to ten as an eight. The victim stated that the following day after the rape, he was able to walk, run a little bit, and play, but he could not play soccer.

The victim denied ever lying about the abuse to get the Defendant in trouble so that he could live with his mother. He admitted, however, that he had told a DCS worker that his mother wanted him to say bad things about the Defendant so that she could obtain custody of him. Defense counsel asked the victim, "[H]ave you ever told a DCS worker that you want to stay with your mother, so to do that, you tell the DCS worker what your mom wants you to tell them?" The victim responded, "Yes, sir. But I say that because he tells me to say that. He threatens me to say that."

The victim conceded that he could not remember testifying at the preliminary hearing that he did not see the Defendant doing drugs but that he saw people putting "white thingies" in their noses. He maintained, however, that the Defendant was ingesting cocaine on the porch. He also conceded that on the day before his trial testimony, he "saw the video of [his] interview with the forensic interviewer," where he stated that the Defendant was doing drugs.

On re-direct examination, the victim confirmed that at the preliminary hearing, he testified that the Defendant had inserted his penis into the victim's anus after waking him in the middle of the night, removing his clothes, and bending him over the couch.

- 4 -

Officer Michael Smith with the Memphis Police Department was the responding officer who spoke with the victim at the hospital on June 24, 2013, around 1:40 a.m. He testified that upon encountering the victim, he found the victim and his mother to be "[s]cared," "[r]eally reluctant," and "[q]uite apprehensive to talk to [him]." Officer Smith stated that he determined that the victim was raped on June 21, 2013. After his interview with the victim and his mother, he took them to the Memphis Sexual Assault Resource Center (MSARC) where a nurse conducted a rape kit on the victim.

Ms. Teresa Onry, a forensic interviewer with the Memphis Child Advocacy Center who interviewed the victim, testified that the victim made a disclosure of physical and sexual abuse. On cross-examination, she stated that it was her job not to investigate the truth of a victim's statement, but only "to give the child an opportunity to say whatever is on [his or her] mind."

Sergeant Marlon Wright with the Special Victim's Unit of the Memphis Police Department, responded to LeBonheur Children's Hospital on June 24, 2013, and spoke with the victim's mother and Officer Smith. After arriving at MSARC, he spoke with the victim and the clinician. He testified that during his investigation, he gathered medical records and submitted the rape kit to the Tennessee Bureau of Investigation (TBI). He did not believe any DNA was recovered during the investigation.

Ms. Amanda Taylor, a sexual assault nurse examiner and an expert witness in sexual assault and forensic examination, testified that on June 24, 2013, she performed an examination on the victim at MSARC. Ms. Taylor stated that she found a perianal laceration on the victim, explaining that the perianal area was "going into the anus on the inside" and that the laceration was caused by blunt force trauma. She collected the victim's medical history for the purpose of making her report by speaking with the victim and his mother. Ms. Taylor testified that before going to the hospital, the victim told his mother that "his butt was hurting." She also testified that the victim's mother thought that the victim had constipation, gave the victim pain reliever, and then brought the victim to the hospital after he stated that he needed to go to the hospital. Ms. Taylor said that at the hospital, the victim told his mother that he had been penetrated by the Defendant. Ms. Taylor stated that during her interview, the victim informed her that "he had just had a bowel movement" and did not

complain of constipation. She also stated that she did not find bleeding, explaining that it was not unusual for blood not to be present because the perianal tissue heals quickly and the laceration was not deep enough. She testified that the rape kit that she collected could have contained DNA from the Defendant but she did not necessarily expect DNA to be present. She concluded, to a reasonable degree of medical certainty, that the injuries reported by the victim were consistent with a sexual assault.

On cross-examination, Ms. Taylor testified that the victim told his mother about the Defendant's actions after his mother asked him whether anyone had done something to him. Ms. Taylor also testified that she did not detect damage to the inside of the victim's anus, explaining that she dilated the anus and could "see just inside" the anus but did not conduct further tests inside the anal cavity, such as a colonoscopy. She admitted that there are certain types of conditions that can mimic sexual abuse, including anal fissures, but stated that the victim's injury was consistent with a penetrating injury. She concluded that "more likely than not" this injury resulted from anal rape because of what the victim told her and the lack of reported history of constipation, diarrhea, or other gastrointestinal issues. She explained that she did not have a reason to believe that the victim was lying to her. She testified that upon examination, she did not find rectal prolapse, anal gaping, thickened anal folds, or venous congestion of the perianal tissues but acknowledged that the aforementioned conditions can be consistent with anal rape. She also testified that during her examination, she did not find any hair and did not have a way of determining whether semen was present. Ms. Taylor testified that DNA can be found "at least up to five days out" from a rape and that her examination took place within five days of the rape. She also testified that although she did not have the results of the DNA sampling, she did conduct a "DNA kit." She stated that she did not find any other injuries, such as "whip marks" on the victim's back or buttocks.

On re-direct examination, Ms. Taylor explained that an anal fissure is usually bigger than a laceration and often goes deeper into the mucosal tissue. She also explained that it was possible that any DNA that belonged to the Defendant could have been expelled when the victim had a bowel movement before examination. She testified that most people who are sexually assaulted do not have associated physical injuries.

Dr. Karen Lakin, the medical director for the LeBonheur Cares Program, an assistant professor of pediatrics for the University of

Tennessee, and a general pediatrician, was accepted as an expert in child abuse pediatrics. She testified that although she did not see the victim herself after the rape, she reviewed . . . Ms. Taylor's report on the victim, including photographs taken of the anal laceration. Dr. Lakin confirmed that the victim's injury was consistent with anal penetration and that the injury would not incapacitate him. She stated that she expected that it would be very difficult to obtain DNA from the perpetrator of a sexual assault after two days of normal daily habits, including bathing and regular bowel movements. Dr. Lakin testified that she believed that the victim's injuries were consistent with an "attempted insertion into the anal canal."

On cross-examination, defense counsel asked Dr. Lakin, "[Y]ou said that you did see [the victim] previous to this, is that correct?" The State objected. During a bench conference, the State argued that defense counsel's question was leading to testimony about prior physical abuse. Defense counsel responded by stating that Dr. Lakin had opened the door to questioning on the matter, arguing that Dr. Lakin said she had previously seen the victim before June of 2013. The trial court sustained the State's objection, reasoning that Dr. Lakin merely said that she had not seen him in June of 2013.

Dr. Lakin testified that she did not believe the victim's injuries would be consistent with those caused by constipation. She noted that constipation could lead to anal fissure and damage to the mucosa, whereas penetrating injuries, such as sexual assault, could lead to anal laceration and damage to the epidermis. She stated that anal sex can damage the inside of the anus and that constipation can damage the anal verge. She also stated that the victim's laceration was at the anal verge.

The State rested its case-in-chief. Defense counsel asked the trial court to reconsider its previous ruling to not allow the introduction of medical and DCS records, stating that the Defendant should be able to bring up a 2007 instance of physical abuse by the victim's mother against the victim that resulted in her loss of custody. The State argued that the past instance of abuse was not relevant and was improper for impeaching the mother because she was not testifying at trial. The State noted that "the other two previous times that the victim was hospitalized at the hands of [the Defendant]" were likewise irrelevant to the instant allegation of abuse. After hearing arguments, the trial court ruled that the 2007 instance of physical abuse by the victim's mother was irrelevant, noting its only purpose would be to impeach the credibility of the mother, which was not

an issue before the jury. The trial court also stated that the Defendant could address the fact that the victim and his mother "had some rough times" but not "specific details about alleged abuse."

The Defendant testified that he and the victim's mother separated when the victim was about two years old. He explained that their relationship became strained after her cancer diagnosis. He stated he told the victim's mother that he would leave and take their son with him. He also stated that she acquiesced in him taking the victim and did not make any effort to contact him or the victim for the following year. He testified that after six months of separation, he received a letter from a hospital stating that the victim's mother was pregnant. He then filed for divorce and sought custody of the victim. In March of 2007, the victim's mother gained primary parent status after the custody hearing. In October of 2007, the Defendant gained custody of both the victim and J.C., the victim's younger brother.

The Defendant explained that after he gained custody, the victim's mother "was very disturbed and upset" and told him that he "was going to regret what [he] had done." He testified that eventually the victim's mother gained visitation rights but that the relationship between the victim's mother and the Defendant did not improve. The Defendant was the primary custodial parent from October 2007 until June 21, 2013. The victim's mother functioned as the primary caregiver during the summer months, but he retained weekend visitation throughout the summer.

The Defendant testified that on Friday, June 21, 2013, he picked up the victim and J.C. from their mother. He also testified that before going to his house, he went to McDonald's and purchased chicken nuggets and spicy chicken sandwiches for J.C. and the victim. The Defendant stated that they did not get to his house until after midnight and that he, the victim, J.C., and his sister had tamales upon arrival. At the time, seven people usually lived at his house: the Defendant, J.C., the victim, the Defendant's sister, her son, and her two daughters. The Defendant stated that after they finished eating, he sent J.C. and the victim to bed. He explained that the bedroom where his children and some of his sister's children slept was small and had multiple beds, including a bunk bed. He testified that on June 21, 2013, the victim slept on the top bunk, J.C. slept on the bottom bunk, and one of his nieces slept in a twin bed in the same bedroom. He also testified that his sister and other niece slept in the adjacent room, explaining that only one wall separated the bedrooms and that you could

hear "normal conversations" going on in the adjacent room. The Defendant slept in the living room on the floor.

The Defendant testified that on June 21, 2013, the children went to bed around 1:00 a.m. and that nothing else occurred that night. He also testified that the following morning, he made breakfast, watched television, played, ate lunch, and then went to the park to play soccer. He stated that on the way to the park, he stopped at a gas station to purchase "Takis," which he described as a ten on a scale of one to ten for spiciness. He said the victim "ate quite a few" of the "Takis." The Defendant testified that after they went to the park, they went back home, watched some movies, and went to bed. He also testified that on the following day, which was Sunday, June 23, 2013, they went to eat Chinese food after church. He stated that the victim ate at the Chinese buffet and that he enjoyed spicy food. The Defendant later dropped J.C. and the victim off at their mother's house and subsequently learned that the victim claimed that he raped him. The rape accusation led to the Defendant losing custody of J.C. and the victim.

On cross-examination, the Defendant testified that whenever he ate spicy food, he would eat a large amount of it and afterwards it would be "hard to go to the bathroom." He admitted, however, that he had not experienced so much pain from spicy food that he could not sit down.

Ms. Yesenia Cerano, the Defendant's sister and the victim's aunt, testified that one can hear conversations and a television through the separating wall between the two bedrooms in her home. She also testified that the victim slept on the top bunk in the room where J.C. and two of her children also slept. She stated that, from her bedroom, she can hear "everything that goes on in the living room." Ms. Cerano testified that on June 21, 2013, she and the Defendant sent the children, including the victim, to bed after eating tamales around midnight. She also testified that she and the Defendant stayed up and watched movies in the living room until about 2:00 a.m. She stated that she did not "hear anything go on that night." She explained that there was a steel grate between her bedroom and the children's bedroom in the hallway that made noise when someone would walk over it.

Ms. Cerano testified that the following morning, they woke up, had breakfast and lunch, and then went to the park. She also testified that while at the park, she took pictures of the victim playing soccer, which were

entered into evidence as exhibits. Ms. Cerano stated that after the park, they went to a gas station to purchase "Takis" and that the victim ate most of the "Takis." The following day, on June 23, 2013, the Defendant, J.C., and the victim went to church. Ms. Cerano testified that after church, she met them at the Chinese buffet and then went home where the children played in a plastic pool. She took pictures of her daughter and the victim playing in the pool. She maintained that she would not lie to protect the Defendant and that she did not see anything suspicious.

On cross-examination, Ms. Cerano testified that she did not come forward with her account of the events following the allegations because no one had questioned her from the police department. She explained that the photographs that were entered into evidence of the victim that she took did not have the time and date printed on them because her cellular phone was not set up to do so.

On re-direct examination, the State was given an opportunity to review Ms. Cerano's cellular phone. Ms. Cerano then reviewed the pictures on her cellular phone and testified that the pictures from the park and the pool were taken on the dates of June 22 and June 23, 2013, respectively.

State v. Juan Cerano, No. W2015-02234-CCA-R3-CD, 2017 WL 1788737, at *1-6 (Tenn. Crim. App. at Jackson, May 4, 2017) (footnote omitted).

After the jury convicted the Petitioner, the trial court merged the aggravated sexual battery conviction into the rape of a child conviction and sentenced him to thirty years in prison. On direct appeal of his convictions, the Petitioner claimed that the trial court's failure to allow him to examine the DCS records and introduce the victim's mother's prior accusations of abuse into evidence deprived him of his right to present a defense. However, trial counsel did not include the DCS records, the transcript of the hearing on the Petitioner's August 11, 2014 motion, or the trial court's order denying the motion in the appellate record. See id. at *7. This court ruled that the Petitioner was not entitled to relief, stating, "Absent the DCS records and the trial court's ruling, we cannot determine what, if any, additional information could have been presented, whether the trial court's disallowance of the evidence violated the Defendant's right to present a defense, or whether any error was harmless beyond a reasonable doubt." Id. at *7.

The Petitioner filed a timely pro se petition for post-conviction relief, claiming that trial counsel was ineffective because he failed to provide this court with a complete record on appeal. The post-conviction court appointed counsel, and post-conviction

- 10 -

counsel filed an amended petition, claiming that the DCS records contained exculpatory information and were admissible under an exception to the hearsay rule or admissible as nonhearsay.

At the evidentiary hearing, trial counsel testified that he had been practicing law for nine years, that eighty percent of his practice involved criminal law, and that he had handled about thirty cases involving sex crimes. The Petitioner met with trial counsel before he was arrested for raping the victim. Trial counsel said that the Petitioner's case was "very complicated" because the Petitioner also was facing a "dependency neglect" case at the same time.

Trial counsel testified that the Petitioner and the victim's mother had "a history," which ended up "tying" into trial counsel's theory of the case. Trial counsel explained that while the Petitioner and the victim's mother were married, the victim's mother was diagnosed with cancer. The victim's mother was cured, and she and the Petitioner separated. The victim's mother's boyfriend abused the victim, so the State awarded custody of the victim and his younger brother to the Petitioner. Trial counsel's theory was that the victim's mother "was doing anything and everything she could to get the children back through various DCS complaints, most [of which] were unfounded." During the allegations, the victim's mother was diagnosed with stage four cancer and "was so desperate to get [the victim] back that she helped convince him to make up the story about the rape."

Trial counsel testified that there were "some inconsistencies" between the victim's forensic interview and his preliminary hearing testimony. The victim's mother died of cancer before trial. Therefore, trial counsel could not call her as a witness or cross-examine her and wanted her to speak "through the DCS records." Trial counsel tried three or four times to have the records admitted into evidence at trial, but the trial court denied his motions. The trial court did conduct an in-camera review of the records and saw "an inconsistency with one sentence." Specifically, "[t]he sentence was where [the victim] told a DCS worker in 2011 . . . that he lies because his mother wants him to lie about the abuse." The trial court ruled that trial counsel could ask the victim about what he said to the DCS worker. If the victim admitted making the statement, then trial counsel "was not allowed to go any further on those records." If the victim lied and said he did not make the statement, then trial counsel could call the DCS worker to rebut his testimony.

Trial counsel testified that during his cross-examination of the victim, he asked if the victim "lies to cover up for his mother about abuse." Trial counsel stated that the victim said yes but that the victim then said he was "really lying to cover up for [the Petitioner]." Trial counsel said he decided "not [to] go further in that questioning"

- 11 -

because he did not want the victim to make additional allegations against the Petitioner in front of the jury. Trial counsel said the DCS records "would [have] shown a history of false allegations" involving the Petitioner and the victim, which was "extremely important" to trial counsel's theory of the case. Moreover, the "whole history" in the records was important, not just one document.

Trial counsel testified that he represented the Petitioner on direct appeal of his convictions and raised the admissibility of the DCS records. However, this court never received the records. Trial counsel said that he should have provided the records to this court and that "I thought I did and I did not. It was just a misunderstanding in procedure. . . . I did not do the procedural mechanism to get them from this building to the Court of [Criminal] Appeals." Trial counsel spent "countless" hours on the Petitioner's trial, the Petitioner was prepared to testify, and the Petitioner testified "wonderfully." Trial counsel stated that the jury's guilty verdict "broke [his] heart" and that he had had "many sleepless nights because of that verdict."

On cross-examination, trial counsel testified that he had been practicing law six years at the time of the Petitioner's trial. He acknowledged that the trial court allowed him to use some of the information from the DCS records at trial and that he tried to attack the victim's credibility by cross-examining him about inconsistencies in his preliminary hearing testimony and trial testimony. The victim changed his story at trial and said that it was the Petitioner, not his mother, who made him lie. The victim's testimony gave trial counsel "great pause," and he decided that he "didn't want to go down that road." Ultimately, the jury's decision "came down" to who it thought was more credible: the victim or the Petitioner. Trial counsel had most of the victim's DCS records in his possession and could have provided them to this court on direct appeal of the Petitioner's convictions.

Trial counsel testified that he wanted the jury to know that Dr. Lakin examined the victim after the victim's mother's boyfriend "crushed" the victim's head and that the abuse resulted in the Petitioner's receiving custody of the victim. The trial court ruled, though, that trial counsel could not question Dr. Lakin about the prior abuse. Trial counsel wanted to show that the victim's mother had lost custody of him and that she was desperate to regain custody. However, the trial court ruled that her credibility was not at issue because she was not "a party to the case." Trial counsel was allowed to present evidence of the "trouble" between the Petitioner and the victim's mother. Trial counsel also was allowed to show that the victim's mother lost custody, but he was not allowed to show why she lost custody.

The Petitioner testified through an interpreter that he met with trial counsel after the victim's mother "pressed the charges" against him. The Petitioner then

"surrender[ed]" to the police. The Petitioner said that "since [he] didn't do anything wrong," he thought that "justice [was] going to be served."

The Petitioner testified that he explained to counsel "what had happened" and that "[t]he day that they said that I committed this crime I was not even in Memphis." The Petitioner told trial counsel that he went to Covington that day and was "with the lady that I was doing some work for." However, trial counsel never investigated the case or called a witness to corroborate that the Petitioner was in Covington. On Sunday, June 21, the Petitioner took his children to the river, and the Petitioner's sister video-recorded them playing soccer with the Petitioner. The Petitioner asked trial counsel to present the video as evidence at trial, but trial counsel failed to do so.

The Petitioner testified that trial counsel told him that the charges would be dismissed if the victim admitted at trial that the victim's mother made the victim lie. The Petitioner asked trial counsel what was going to happen if the victim denied that the victim's mother made the victim lie. Trial counsel answered, "[D]on't worry because I've already contacted the person that he lied to, so he would be discredited." Trial counsel told the Petitioner that he had subpoenaed the DCS worker and that she would testify for the Petitioner.

The Petitioner testified that trial counsel said he needed $2,000 to hire "an expert in rape." The Petitioner's family gave the money to trial counsel, but trial counsel did not call the expert to testify. The Petitioner acknowledged that after he was convicted, trial counsel returned the money to his family.

On cross-examination, the Petitioner testified that on June 19, he picked up the children at 6:00 p.m. and they went with him to Covington. The Petitioner and the children returned to Memphis and had dinner "around twelve," and the children went to sleep. The Petitioner testified that trial counsel told him on the day of trial, "[N]o, don't say that because that's going to hurt you." The Petitioner denied testifying at trial that he was at home with the victim when the alleged abuse occurred. However, he acknowledged that the woman from Covington was not with him when he and the children returned to Memphis.

The Petitioner acknowledged that photographs of the children playing in a swimming pool on June 21 were introduced into evidence at trial. He said, though, that trial counsel should have presented the video of the children playing at the river because "it doesn't make sense a child that has been abused and has been beaten was happily playing at the park with me."

In a written order, the post-conviction court denied the petition for post-conviction relief. The court found that trial counsel was deficient for not preparing a proper appellate record for this court on direct appeal of the Petitioner's convictions. However, the post-conviction court found that the Petitioner failed to demonstrate prejudice. The post-conviction court, which also presided over the Petitioner's trial, explained that it was aware of only one instance in the DCS records in which the victim said his mother told him to lie, that it ruled the victim could be questioned about his statement, and that trial counsel questioned the victim about the statement during cross-examination. The post-conviction court then stated as follows:

> Trial counsel argued that he was prevented from presenting a defense because the Court refused to let him impeach the victim with statements made by his deceased mother. After a hearing the Court found that this use of the DCS records was not proper. The Court clearly told trial counsel that if any of these allegations could be shown to originate from the victim or that the victim adopted his mother's allegation, then trial counsel could ask the victim about this. Neither trial counsel nor the petitioner has made any specific reference to anything in the record that would support his theory. . . . In this case some of these records could have been used to impeach the mother had she testified. A review of the records only shows one instance where a statement of the victim indicates that he lied because his mother told him [to]. This information was used at trial. Since the mother had died prior to trial, a fact that was never in dispute, the Court does not see how the inclusion of the rest of these records on appeal would have resulted in appellate relief.

The Petitioner timely appealed the ruling of the post-conviction court.

## II.  Analysis

The Petitioner contends that the post-conviction court erred in finding that he was not prejudiced by trial counsel's failure to include the DCS records in the record on direct appeal of his convictions. Specifically, he asserts that the records contained exculpatory information "of the deceased mother of the victim making false claims against [the Petitioner], and others about physical abuse and neglect which could have been used to challenge the victim's veracity" and that trial counsel's failure prevented this court from reviewing the issue of whether the trial court properly determined that the records were inadmissible at trial. The State argues that the Petitioner cannot establish prejudice because he failed to provide the post-conviction court with two of the three items this court stated it needed for an adequate review:  a transcript of the hearing in which the trial court ruled that the records were inadmissible and the trial court's order regarding its

ruling. The State also argues that, in any event, the Petitioner has failed to demonstrate prejudice because trial counsel was able to impeach the victim's credibility and because the Petitioner testified at trial about the victim's mother's threat to regain custody of the victim. Finally, the State argues that the Petitioner was not denied his right to present a defense because the DCS records were not critical to his defense and because he was allowed to present his defense through his impeachment of the victim.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address

the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Turning to the instant case, the post-conviction court found that trial counsel was deficient for not including the DCS records in the record on direct appeal of the Petitioner's convictions. Trial counsel testified that he should have provided the DCS records to this court and that his failure to do so was "a misunderstanding in procedure." Therefore, we agree with the post-conviction court that trial counsel was deficient.

The State claims that the Petitioner cannot establish prejudice because he failed to include a transcript of the hearing in which the trial court ruled that the records were inadmissible and the trial court's order regarding its ruling in the post-conviction record. At the conclusion of the post-conviction evidentiary hearing, post-conviction counsel advised the post-conviction court that he wanted to "get some good copies so we can preserve for appeal and send up what was failed to be sent up before." Specifically, defense counsel requested to introduce into evidence the DCS records and "a transcript of the motion hearing where your Honor denied [trial counsel's] request to allow those to be entered into evidence [at trial]." Post-conviction counsel called trial counsel to the stand, trial counsel identified the DCS records, and post-conviction counsel introduced them into evidence as Exhibit 1. The post-conviction court stated that the court thought a transcript of the motion hearing was prepared but that if not, "just enter an order to have it done." Post-conviction counsel responded, "I will, Judge." However, neither the transcript of the hearing nor an order for the transcript are in the appellate record. It is an appellant's duty to provide a record that is sufficient "to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). When the transcript of the proceedings relevant to the issue presented for review is not included in the record, this court is precluded from considering the issue. State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

In any event, even if the Petitioner had included the hearing transcript in the record before us so that we could determine whether the trial court erred by denying the Petitioner's motion to introduce the records into evidence at trial, we would have to conclude that he has failed to demonstrate prejudice. The Petitioner contends that "[t]he probative value of these documents was that it contained [a] record of the deceased mother of the victim making false claims against [the Petitioner], and others about physical abuse and neglect which could have been used to challenge the victim's veracity." However, the trial court allowed trial counsel to ask the victim, "[H]ave you ever told a DCS worker that you want to stay with your mother, so to do that, you tell the DCS worker what your mom wants you to tell them?" The victim responded, "Yes, sir.

- 16 -

But I say that because he tells me to say that.  He threatens me to say that."  Trial counsel testified that at that point, he decided not to question the victim about the issue further because he was concerned the victim would make additional allegations of abuse against the Petitioner.  Although trial counsel subsequently testified that the DCS records "would [have] shown a history of false allegations" against the Petitioner by the victim's mother, trial counsel did not say what more he would have done with the records or how he would have used them to impeach the victim.  Moreover, the Petitioner has failed to identify for this court which DCS documents trial counsel could have used to show that the victim's mother had a history of making false allegations or explained how trial counsel could have introduced those documents into evidence.  The Petitioner has had the DCS records for some time and is aware of the information contained in the records, yet he expects this court to review years of records, identify exculpatory information, and speculate as to how trial counsel would have put that evidence before the jury.  Accordingly, we must conclude that the Petitioner has failed to demonstrate prejudice in this case.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE